RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NORTHVILLE DOWNS,

        *Plaintiff-Appellant,*

OIL CAPITAL RACE VENTURE, INC., dba Mt.
Pleasant Meadows; GREAT LAKES
QUARTERHORSE ASSOCIATION,

        *Plaintiffs,*

    *v.*

GOVERNOR OF THE STATE OF MICHIGAN,
Jennifer Granholm; MICHIGAN ATTORNEY
GENERAL, Michael A. Cox; MGM GRAND
DETROIT, LLC,

        *Defendants-Appellees.*

No. 09-1370

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 08-11858—Avern Cohn, District Judge.

Argued: January 20, 2010

Decided and Filed: September 27, 2010

Before: MERRITT, GIBBONS, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Phillip B. Maxwell, PHILLIP B. MAXWELL & ASSOCIATES, PLLC, Oxford, Michigan, for Appellant. Melinda A. Leonard, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Peter H. Ellsworth, DICKINSON WRIGHT PLLC, Lansing, Michigan, for Appellees. **ON BRIEF:** Phillip B. Maxwell, PHILLIP B. MAXWELL & ASSOCIATES, PLLC, Oxford, Michigan, Edward Draugelis, DRAUGELIS & ASHTON LLP, Clawson, Michigan, for Appellant. Melinda A. Leonard, Donald S. McGehee, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, Peter H. Ellsworth, Jeffery V. Stuckey, DICKINSON WRIGHT PLLC, Lansing, Michigan, Phillip J. DeRosier, DICKINSON WRIGHT PLLC, Detroit, Michigan, for Appellees.

GIBBONS, J., delivered the opinion of the court, in which ROGERS, J., joined. MERRITT, J. (pp. 15–16), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

JULIA SMITH GIBBONS, Circuit Judge.  Plaintiff-appellant Northville Downs appeals the district court's grant of judgment on the pleadings to defendants-appellees Jennifer Granholm, Governor of the State of Michigan, Michael A. Cox, Attorney General of Michigan, and MGM Grand Detroit, LLC (collectively, "the defendants"). Northville Downs, Oil Capital Race Venture, Inc., and Great Lakes Quarterhorse Association (collectively, "the plaintiffs") sued the defendants under 42 U.S.C. § 1983, alleging that article IV, section 41 of the Michigan Constitution, as amended by voter referendum, violates their federal constitutional rights under the First Amendment, Equal Protection Clause, and Commerce Clause.  For the following reasons, we affirm the district court's decision.

I.

The plaintiffs operate several horse-racing tracks in Michigan.  A significant part of their operations involves simulcast wagering, in which a horse race that takes place in one location, often outside of Michigan, is simultaneously broadcast to one or more other locations to allow bettors to wager in the same betting pool.  The plaintiffs' business has been decimated in recent years by competition from the state lottery and casino gaming.  According to the plaintiffs' expert, Dr. Richard Thalheimer, wagering at Detroit-area tracks, in real terms, declined eighty-five percent between 1972, when casino gaming began in the state, and 2007.  The defendants are state officials and the operator of a casino in Detroit.

Before 1972, horse-racing was the only legal form of gambling in Michigan.  In 1972, Michigan amended its constitution to allow the legislature to "authorize lotteries and permit the sale of lottery tickets in the manner provided by law."  Mich. Const. art.

IV, § 41 (amended 1972). The legislature created a state lottery in 1972, Mich. Comp. Laws § 432.1 *et seq.*, and authorized charitable gambling soon thereafter, Mich. Comp. Laws § 432.101 *et seq.* In the 1980s, a number of Indian gaming casinos also opened in the state pursuant to a federal law under which tribes may negotiate compacts with states and receive authorization for gambling activities. *See* 25 U.S.C. § 2701 *et seq.*

In 1996, Michigan voters expanded legalized gambling in the state through Proposal E. Initiated Law 1 of 1996 (codified at Mich. Comp. Laws. §§ 432.201–432.226). This provision allowed limited casino gambling in Detroit. The legislature subsequently created the Michigan Gaming Control Board ("the Board"). Mich. Comp. Laws. § 432.204. The new law permitted up to three gaming casinos in any city whose local legislature enacted an ordinance approving casino gambling and that met the following qualifications: (1) population of 800,000 or more; (2) located within 100 miles of any other state or country in which gaming is authorized; and (3) has had casino gaming approved by a majority of the voters in the city. Mich Comp. Laws §§ 432.206(3), 432.202(I), 432.203, 432.206(1)(a), (2), (3). The Board does not have authority over federally regulated Indian casinos. *See* Mich. Comp. Laws § 432.203(2)(d).

In the early 2000s, horse-race tracks lobbied the legislature for approval to offer slot machines, off-track racing theaters, and account wagering. They succeeded in persuading the Michigan House of Representatives and Senate to pass bills in their favor in 2004. These bills were not yet enacted when existing casino interests financed a referendum initiative that appeared as Proposal 1 on the 2004 general election ballot. As recounted by the district court, the official ballot language read:

PROPOSAL 04-1

A PROPOSAL TO AMEND THE STATE CONSTITUTION TO REQUIRE VOTER APPROVAL OF ANY FORM OF GAMBLING AUTHORIZED BY LAW AND CERTAIN NEW STATE LOTTERY GAMES

The proposed constitutional amendment would:
- Require voter approval of any form of gambling authorized by law after January 1, 2004.
- Require voter approval of any new state lottery games utilizing "table games" or "player operated mechanical or electronic devices" introduced after January 1, 2004.
- Provide that when voter approval is required, both statewide voter approval and voter approval in the city or township where gambling will take place must be obtained.
- Specify that the voter approval requirement does not apply to Indian tribal gaming or gambling in up to three casinos located in the City of Detroit.

Should this proposal be adopted?
Yes
No

*Northville Downs v. Granholm*, No. 08-11858, 2009 WL 483076, at * 2 & n.3 (E.D. Mich. Feb. 25, 2009).

The voters approved the proposal and amended article IV, section 41 of the state constitution to read:

> The legislature may authorize lotteries and permit the sale of lottery tickets in the manner provided by law. No law enacted after January 1, 2004, that authorizes any form of gambling shall be effective, nor after January 1, 2004, shall any new state lottery games utilizing table games or player operated mechanical or electronic devices be established, without the approval of a majority of electors voting in a statewide general election and a majority of electors voting in the township or city where gambling will take place. This section shall not apply to gambling in up to three casinos in the City of Detroit or to Indian tribal gaming.

Mich. Const. art. IV, § 41 (amended 2004) (hereinafter "Proposal 1").

In May 2008, the plaintiffs brought suit in federal district court under 42 U.S.C. § 1983, seeking an injunction against the enforcement of Proposal 1 and a declaration of its invalidity on the grounds that it violated the federal Constitution and various state laws. The district court dismissed the state law counts, leaving only federal constitutional claims under the Commerce Clause, First Amendment, and Equal Protection Clause of the Fourteenth Amendment.

In August 2008, the defendants moved for judgment on the pleadings. The exhibits to the motion included the legislative history of the 2004 state House and Senate bills, a newspaper article characterizing the proponents of Proposal 1 as "an unlikely combination of anti-gambling interests, Detroit casino owners and Indian tribe-owned casinos," and a newspaper article reporting on the success of Proposal E's expansion of gambling in 1996. The plaintiffs filed a response to the motion and filed a cross-motion for partial summary judgment on the basis of their second amended complaint, which was included in the motion papers but had not yet been filed with the district court. The exhibits to the plaintiffs' response and motion included affidavits from one of the sponsors of the state legislation, the plaintiffs' economic expert, and one of the plaintiffs' owners; the texts of the 2004 state legislation; legislative analysis of these bills; newspaper articles; and the texts of a proposed 2008 amendment to the state constitution and implementing legislation allowing Detroit casinos to take bets on horse-racing.

The district court denied the plaintiffs' motion for partial summary judgment without prejudice to its renewal after disposition of the motion for judgment on the pleadings. The court then gave the plaintiffs leave to file their second amended complaint and did not require the defendants to file an answer until the court ruled on the motion for judgment on the pleadings.

On February 25, 2009, the district court granted judgment on the pleadings to the defendants on the allegations contained in the second amended complaint. With respect to the First Amendment claim, the district court ruled that the plaintiffs lacked standing

because they had alleged only a subjective chill of their speech that was insufficient to show an injury-in-fact. The district court then ruled that the plaintiffs' Dormant Commerce Clause claim failed because they had not shown any discrimination in favor of in-state interests and they had not shown that their decreasing revenues amounted to a burden on interstate commerce. Finally, the district court reasoned that the plaintiffs were not entitled to "heightened scrutiny" under the Equal Protection Clause. The court granted judgment on this count and held that Proposal 1 survived rational basis review because Michigan had a legitimate governmental interest in regulating gambling. Northville Downs timely appealed.

## II.

Before turning to the merits, we first address the applicable standard of review. Northville Downs contends that the district court committed reversible error by deciding this case under Federal Rule of Civil Procedure 12(c) rather than Federal Rule of Civil Procedure 56. It argues that the district court improperly considered matters outside the pleadings and that the plaintiffs were not given a reasonable opportunity to respond.

"Motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) are analyzed under the same *de novo* standard as motions to dismiss pursuant to Rule 12(b)(6)." *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th Cir. 2008) (citation omitted). It is well-established that "Rule 12(c) requires only one action by the district court for the conversion to a summary judgment motion to occur: failure to exclude presented outside evidence." *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 503 (6th Cir. 2006). *Max Arnold* makes clear that the district court need not actually rely upon materials outside of the pleadings to require the conversion of a Rule 12(c) motion into a motion for summary judgment. *Id*. If the district court failed to exclude evidence outside of the pleadings, we "construe[] the district court's denial of [a] motion for judgment on the pleadings as a denial of [a] motion for summary judgment." *Id.* Although a district court should give the parties notice and an opportunity to present all material relevant to a motion for summary

judgment, "[t]he district court's failure to give such notice and opportunity to respond is not reversible error . . . where all parties in fact had a sufficient opportunity to present pertinent materials." *Id.* at 504 (citation omitted).

Northville Downs contends that the district court converted the defendants' motion into a motion for summary judgment because it: (1) referred to the affidavit of their economic expert and data from the Michigan Attorney General; and (2) referred to its own research on the history of horse-racing in Michigan. It argues that, had the district court given the plaintiffs notice and an opportunity to submit all relevant material, they would have presented material pertinent to their Commerce Clause claim, namely evidence of the revenues they have lost from the decline in out-of-state-generated simulcast wagering.

Because the district court did not exclude materials outside of the pleadings, we conclude that it converted the defendants' Rule 12(c) motion into a Rule 56(c) motion for summary judgment under *Max Arnold*. First, Northville Downs is correct that the district court did not exclude Thalheimer's affidavit, which was not submitted with the pleadings. Moreover, the district court relied upon an article from the Detroit Free Press, submitted by the defendants as an exhibit to their Rule 12(c) motion. Finally, at no point did the district court exclude the exhibits submitted by either party on the Rule 12(c) motion, even though it denied the plaintiffs' motion for partial summary judgment.

The district court's failure to exclude the extraneous materials is not reversible error for four reasons, however. First, *Max Arnold* does not require reversal and remand so long as the parties "in fact had a sufficient opportunity to present pertinent materials." 452 F.3d at 504. Here, the plaintiffs themselves moved for summary judgment at the same time they responded to the motion for judgment on the pleadings and, thus, had every opportunity to present "pertinent materials" in support of their claims. The record shows they did exactly that. The plaintiffs submitted seven exhibits, including affidavits attesting to the economic impact of Proposal 1 on their businesses, legislative materials, and newspaper articles rebutting the defendants' arguments. Second, we have held:

> [A] party cannot raise for the first time on appeal an argument that [it]
> was surprised by the conversion of the motion to dismiss into a motion
> for summary judgment when the party was aware that materials outside
> the pleading had been submitted to the court before the court granted the
> motion.

*Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997) (citation omitted). Indeed, the plaintiffs submitted extraneous evidence in the exhibits that ostensibly applied only to the defendants' Rule 12(c) motion. Third, the district court's exposition of the background of Michigan gaming "considered matters outside the pleadings [but] those matters simply filled in the contours and details of the plaintiff[s'] complaint, and added nothing new." *Id.* The district court was well within its discretion to take judicial notice of the legislative and constitutional history of gaming regulation in Michigan, especially where such materials did not speak to any disputed fact. *See, e.g.*, *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) ("A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." (citation omitted)). Finally, Northville Downs has shown no prejudice from its supposed inability to submit more evidence on the Commerce Clause claim. As we explain below, this claim lacks merit as a matter of law, and the plaintiffs had ample opportunity to submit evidence in their favor. Any additional evidence would have no bearing on the underlying legal issues.

When considering a motion that has been converted from a Rule 12(c) motion to a motion for summary judgment, we still review the district court's decision *de novo*. *Max Arnold*, 452 F.3d at 504. However, we apply Rule 56(c), which provides that the moving party is entitled to summary judgment if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (2). We must view the facts and all inferences drawn from the facts in the light most favorable to the nonmoving party. *Max Arnold*, 452 F.3d at 504.

III.

"The Equal Protection Clause protects against arbitrary classifications, and requires that similarly situated persons be treated equally." *Bowman v. United States*, 564 F.3d 765, 772 (6th Cir. 2008) (citation and internal quotation marks omitted). Thus, "[t]o state an equal protection claim, a party must claim that the government treated similarly situated persons differently." *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008) (citation omitted).

Once disparate treatment is shown, the legal standard for analyzing any equal protection claim depends upon the classification used by the government. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440 (citations omitted). "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (citations omitted).

In addition, the Supreme Court has recognized that laws restructuring the political system to the detriment of protected classes may run afoul of the Equal Protection Clause. *See Hunter v. Erickson*, 393 U.S. 385, 393 (1969) ("[T]he State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." (citations omitted)); *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 467 (1982) ("[T]he Fourteenth Amendment also reaches a political structure that treats all individuals as equals, yet more subtly distorts

governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation." (citation and internal quotation marks omitted)).

With respect to the claim of discriminatory treatment, Northville Downs contends that Proposal 1 creates two classes of gaming licensees: one required to obtain voter approval for an expansion of gaming and another class exempted from such a requirement. It argues that Proposal 1 is discriminatory on its face because the law treats the plaintiffs and similarly situated casino gambling interests in Michigan differently.

Even if we accept this characterization of Proposal 1, we must sustain it as economic regulation so long as there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313 (citations omitted); *see also City of Cleburne*, 473 U.S. at 440–41. Proposal 1 easily passes this test because it is well-established that the regulation of gambling, including limitations on gaming such as those contained in Proposal 1, is a legitimate state interest. *See Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 341 (1986) (recognizing that a state has an interest in regulating gambling to protect the "health, safety, and welfare of its citizens"); *United States v. Washington*, 879 F.2d 1400, 1401 (6th Cir. 1989) ("The enactment of gambling laws is clearly a proper exercise of the state's police power in an effort to promote the public welfare."). The exemptions for Indian gaming and Detroit casinos similarly survive rational basis review under *Beach Communications* because federal law preempts Michigan from regulating gaming on tribal lands and because Michigan voters recognized the value of promoting the economic revitalization of Detroit with casino gambling in Proposal E in 1996. *See* Mich. Comp. Laws § 432.202(l) (defining a "city" such that only Detroit would qualify).

Plaintiffs' reliance on *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), is misplaced. In that case, we held unconstitutional a Tennessee statute that prohibited the sale of caskets by anyone other than a state-licensed funeral director, including businesses that sold caskets but did not provide other services. *Id*. at 229. We

determined that the statute failed rational basis review because the state's desire to protect "a discrete interest group from economic competition" was not a legitimate state interest. *Id*. at 224 (citing Dormant Commerce Clause cases). However, Proposal 1 does not, on its face, protect a discrete interest group. Instead, the provision applies generally to all businesses seeking to establish new forms of gambling in the state. Thus, Proposal 1 is rationally related to Michigan's legitimate interests in regulating gambling and promoting economic revitalization.

Next, Northville Downs contends that Proposal 1 violates the Equal Protection Clause, as interpreted by *Hunter v. Erickson*, by altering the political structure of Michigan to render the plaintiffs' attempts to obtain favorable gambling legislation futile. *See* 393 U.S. at 393. In *Hunter*, the Supreme Court invalidated an amendment to the Akron, Ohio, city charter that suspended the city's housing discrimination law and prevented the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of the city's voters. *Id*. at 387. The Supreme Court concluded that a law explicitly treating racial housing issues differently from other housing issues impermissibly disadvantaged groups that would have benefitted from laws barring such discrimination. *Id*. at 393.

*Hunter* does not require that Proposal 1 apply to the entire gambling market in Michigan in order to survive constitutional scrutiny. Northville Downs's reliance upon the phrase "any particular group," *id.*, and Justice Harlan's concurrence, *id*. at 393–94 (concluding that laws may permissibly structure political institutions using "neutral principles" or "general democratic principle") (Harlan, J., concurring), overlooks the reality that, by its terms, *Hunter* confronted a constitutionally impermissible classification on the basis of race that is not present here. Furthermore, Northville Downs cannot overcome governing precedent holding that states may make fine distinctions in regulating gaming, up to and including favoring certain forms of gambling over others. *Posadas de P.R. Assocs.*, 478 U.S. at 341; *Washington*, 879 F.2d at 1401.

IV.

In its next claim for relief, Northville Downs argues that it engages in interstate commerce because it broadcasts races from out-of-state tracks and takes bets on the interstate simulcast and, thus, Proposal 1 discriminates against interstate simulcast wagering in favor of in-state casino wagering in violation of the Dormant Commerce Clause doctrine.

The Dormant Commerce Clause doctrine focuses on "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988) (citations omitted). Courts inquire "whether a challenged law discriminates against interstate commerce." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (citation omitted). "A discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* (citations and quotation marks omitted). If a state law does not discriminate and "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Dormant Commerce Clause "protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127–28 (1978).

Proposal 1, even if it were deemed to put a regulatory burden on the racetracks, does not create a discriminatory burden that triggers Dormant Commerce Clause scrutiny. Proposal 1 is instead exactly like the state statute upheld in *Exxon*, *supra*. Maryland precluded ownership of gas stations by oil refiners, and all of the oil refiners were out-of-state. Nonetheless, the Supreme Court flatly concluded that there was no burden for purposes of the Dormant Commerce Clause. "The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim

of discrimination against interstate commerce." *Id.* at 126. Proposal 1 does not regulate horse-racing or betting on horse-racing. In effect, it merely prevents the horse-racing tracks from installing slot machines, running off-track racing theaters, and offering account wagering without voter approval while not banning such gaming activities at entirely different casino facilities in Detroit. Plaintiffs have not shown that, in effect, Michigan has protected the in-state simulcast wagering *market* against out-of-state simulcast wagering. *See Exxon Corp.*, 437 U.S. at 127–28. Proposal 1 does not, for example, prohibit out-of-state simulcast producers from broadcasting races in Michigan in order to protect in-state forms of gambling that compete with betting on horse races. The effect of Proposal 1 is to allow one set of in-state *firms*, namely three Detroit-area casinos, to offer slot machines and other forms of gambling that other in-state firms, namely the plaintiff race tracks, may not without voter approval. Thus, whatever burden Proposition 1 places on the racetracks, it is not a burden on interstate commerce for Dormant Commerce Clause purposes.

Because Proposal 1 does not prohibit out-of-state simulcast producers from broadcasting races into Michigan, Northville Downs's argument that *Granholm v. Heald*, 544 U.S. 460 (2005), and *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981), demonstrate the constitutional infirmity of Proposal 1 is likewise unavailing. In *Heald*, the Supreme Court invalidated Michigan and New York laws that permitted in-state wineries to ship directly to customers while requiring out-of-state wineries to either use in-state distributors or establish a distribution operation in-state. 544 U.S. at 473–74. The plaintiffs in that case were the owners of out-of-state wineries that sought access to the Michigan market. *Id.* at 468. By contrast, the plaintiffs in this case operate in-state race tracks that have, in effect, been prevented from establishing certain forms of gambling. Whereas the *Granholm* Court emphasized that Michigan's wine-importation and distribution laws deprived out-of-state citizens of "their right to have access to the markets of other States on equal terms," *id.* at 473, Proposal 1 does not prevent out-of-state simulcast providers from offering their product in Michigan either at the existing

race tracks, establishments that obtain voter approval permission to offer new forms of gambling, or at the three Detroit casinos.

In *Clover Leaf Creamery Co.*, the Supreme Court sustained a Minnesota law that prohibited the sale of dairy products in certain plastic containers while allowing the sale of dairy products in other containers, such as paperboard milk cartons. 449 U.S. at 458. The Court found that the law regulated commerce "evenhandedly by prohibiting all milk retailers from selling their products in plastic, nonreturnable milk containers, without regard to whether the milk, the containers, or the sellers [were] from outside the State." *Id*. at 471–72 (internal quotation marks omitted). Further, the Court held that the burden imposed on interstate commerce by the law was "relatively minor" because although out-of-state dairies would have to conform their packaging to Minnesota's standards, there was "no reason to suspect that the gainers [would] be Minnesota firms, or the losers out-of-state firms." *Id*. at 472–73. Thus, *Clover Leaf* undermines Northville Downs's position in this case because Proposal 1 "evenhandedly" regulates Michigan's gaming market and the plaintiffs have not shown that in-state firms would gain from such regulation at the expense of out-of-state simulcast providers.

V.

For the foregoing reasons, we affirm the district court's decision.[1]

---

[1]We need not reach Northville Downs's First Amendment claims because, as Northville Downs conceded at oral argument, the merits of these claims depend upon the success of its Equal Protection Clause and Commerce Clause claims.

---

**CONCURRENCE**

---

MERRITT, Circuit Judge, concurring.  State regulation of gambling is different from state regulation of cantaloupes,[1] oil and gas,[2] milk,[3] trash,[4] and similar products and services.  Gambling may be outlawed altogether as a vice that is a threat to the health, safety and welfare of the public.  Through a democratic referendum process, it may be outlawed or the market for gambling limited.  Although Proposal 1 creates on its face a monopoly for three Detroit casinos engaged in casino-type gambling games, the law continues to permit plaintiffs to engage in para-mutual betting on in-state racing and "simulcast" out-of-state racing.  In the case of gambling, whether a law discriminates facially or otherwise against potential in-state or out-of-state gambling enterprises appears to be constitutionally irrelevant.  The ban on gambling may be either total or selective because the Supreme Court has made it clear that the "greater includes the lesser."  If gambling is to be treated as any other normal item of commerce, the Supreme Court will have to overrule *Posadas de Puerto Rico Associates v. Tourism Company of Puerto Rico*, 478 U.S. 328 (1986), in which the Court reasoned as follows:

> [I]t is precisely because the government could have enacted a wholesale prohibition of the underlying conduct [gambling] that it is permissible for the government to take the less intrusive step of allowing the conduct but reducing the demand through restrictions . . . . It would just as surely be a strange constitutional doctrine which would concede to the legislature the authority to totally ban a product or activity, but deny to the legislature the authority to forbid the stimulation of demand for the product or activity . . . .

---

[1] *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).

[2] *Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978).

[3] *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981).

[4] *Philadelphia v. New Jersey*, 437 U.S. 617 (1978).

In the *Posadas* case, the Supreme Court was dealing with a prohibition on the advertising of gambling enterprises to residents of Puerto Rico, but allowing such advertising to people everywhere else.  Puerto Rico was happy to let nonresidents lose their money at casinos but not its own citizens.  The law clearly discriminated on its face and created a prior restraint on speech directed at Puerto Ricans.  If such in-state and out-of-state discrimination is irrelevant when dealing with what would otherwise constitute a clear free speech violation, it is certainly irrelevant with respect to less restrictive constitutional provisions like the Commerce Clause.[5]  Therefore, I do not see the need for an analysis of the degree of the "discriminatory burden that triggers Dormant Commerce Clause scrutiny." (Maj. op. 12.)  The more general rule of *Posadas* makes a weighing process unnecessary concerning the amount of interstate commerce affected by the Proposal 1's gambling restrictions.

If the economic activity were different so that the monopoly consisted of three TV stations or three barge companies and the aggrieved party was a newspaper or a manufacturer of tow boats, we would most likely say that we have a law discriminatory on its face and that the monopoly burdens interstate and intrastate commerce.  In such an obvious case of economic protectionism, our analysis and weighing process would be entirely different.  These hypothetical cases prove to me that the outcome is driven by the fact that the activity is gambling.  If it were milk, news or shipping, our attitude and the result would change.  *Posadas* is the key, not *Exxon*.

---

[5]The language from *Posadas* quoted in the text has been questioned in later cases but not overruled.  *See Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 509 (1996); *Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 182-83 (1999).