RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0010p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ZILLOW, INC.,

       *Plaintiff-Appellee/Cross-Appellant*,

    *v.*

THOMAS B. MILLER, Commissioner of the Kentucky Department of Revenue; BRAD MCDOWELL, Property Valuation Administrator for Shelby County, Kentucky; KELLIE LANG, Property Valuation Administrator for Franklin County, Kentucky; JASON SCRIBER, Property Valuation Administrator for Henry County, Kentucky; BLAKE ROBERTSON, Property Valuation Administrator for Owen County, Kentucky; JILL M. MAHONEY, Property Valuation Administrator for Trimble County, Kentucky; JADA BRADY, Property Valuation Administrator for Clark County, Kentucky,

       *Defendants-Appellees* (23-5300),

KENTUCKY PRESS ASSOCIATION, INC.; AMERICAN CITY BUSINESS JOURNALS, INC., dba Louisville Business First,

       *Intervenor Plaintiffs-Appellants/Cross-Appellees*.

Nos. 23-5300/5301

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
No. 3:19-cv-00049—Gregory F. Van Tatenhove, District Judge.

Argued:  March 19, 2024

Decided and Filed:  January 16, 2025

Before:  BOGGS, MOORE, and GIBBONS, Circuit Judges.

—————————

**COUNSEL**

**ARGUED:** Michael P. Abate, KAPLAN, JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, for the Newspapers. Richard W. Bertelson, III, OFFICE OF LEGAL SERVICES FOR REVENUE, Frankfort, Kentucky, for the County Valuation Administrators. Darren W. Ford, FARUKI PLL, Cincinnati, Ohio, for Zillow, Inc. **ON BRIEF:** Michael P. Abate, Burt A. (Chuck) Stinson, KAPLAN, JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, for the Newspapers. Richard W. Bertelson, III, OFFICE OF LEGAL SERVICES FOR REVENUE, Frankfort, Kentucky, for the County Valuation Administrators. Darren W. Ford, John C. Greiner, FARUKI PLL, Cincinnati, Ohio, for Zillow, Inc. Daniel J. Grabowski, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Amicus Curiae.

MOORE, J., delivered the opinion of the court in which GIBBONS, J., concurred. BOGGS, J. (pp. 22–29), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

KAREN NELSON MOORE, Circuit Judge. Kentucky's Open Records Act ("KORA") provides access to public records. It distinguishes between requestors with commercial and non-commercial purposes and permits agencies to impose enhanced fees on requestors with commercial purposes. The statute provides, however, that commercial purposes do not include publication in a newspaper or periodical, use by a radio or television station in its news or informational programs, or use in litigation or claims settlement.

Zillow, Inc. ("Zillow") is a for-profit corporation that publishes, among other things, information about properties (including their tax history and price) on its website, which is free for users to access. Zillow routinely requests information from governmental agencies regarding pricing and tax information, to keep its website current. When Zillow requested information from several Kentucky property valuation administrators ("PVAs"), including the six named in this action, the PVAs determined that Zillow's requests had a commercial purpose and responded with quotes for thousands of dollars. Zillow sued the Kentucky Department of Revenue and the PVAs, arguing that the Kentucky statute violated the First and Fourteenth Amendments facially and as applied.

Turning first to Zillow's facial challenge, the district court held that the commercial/non-commercial purpose distinction did not violate the First or Fourteenth Amendments, but that the "newspaper exception" did. It consequently severed the newspaper exception from the rest of the Kentucky statute. The upshot of the district court's decision was that both Zillow and newspapers (who were not at that time party to the action) became subject to enhanced fees. The Kentucky Press Association and American City Business Journals (collectively, "the Press") intervened. The Press and Zillow appealed.

On appeal, we turn first to Zillow's as-applied challenge. We hold that the commercial-fee statute does not violate the First Amendment as applied to Zillow and reverse the district court's order declaring the "newspaper exception" unconstitutional because the commercial/non-commercial purpose distinction, including its three exceptions, do not impermissibly discriminate based on the content of Zillow's speech. Accordingly, we reverse the district court's grant of partial summary judgment to Zillow, vacate the permanent injunction entered by the district court, and remand with instructions to grant summary judgment to the PVAs.

## I. BACKGROUND

### A. Kentucky's Open Records Act

KORA provides that "applicant[s] shall have the right to make abstracts of the public records and memoranda thereof, and to obtain copies of all [nonexempt] public records." Ky. Rev. Stat. § 61.874(1). Public agencies are authorized to charge applicants a "reasonable fee." *Id.* § 61.874(3)–(4). The reasonable fee is determined by whether the requestor has a "noncommercial" or "commercial" purpose. *Id.* A "commercial purpose" is defined as "the direct or indirect use of any part of a public record or records, in any form, for sale, resale, solicitation, rent, or lease of a service, or any use by which the user expects a profit either through commission, salary, or fee." *Id.* § 61.870(4)(a) (emphasis added). However, the term commercial purpose excludes:

(1) Publication or related use of a public record by a newspaper or periodical [("the newspaper exception")];

(2) Use of a public record by a radio or television station in its news or other informational programs; or

(3) Use of a public record in the preparation for prosecution or defense of litigation, or claims settlement by the parties to such action, or the attorneys representing the parties.

*Id.* § 61.870(4)(b).   Noncommercial purpose is not defined by statute and, accordingly, we presume it refers to all other purposes not defined as "commercial."

When an applicant seeks records for a "noncommercial" purpose, a Kentucky public agency "may prescribe a reasonable fee for making copies" of such records, but the fee "shall not exceed the actual cost of reproduction."   Ky. Rev. Stat. § 61.874(3).   By contrast, when an applicant seeks records for a "commercial" purpose, the public agency may additionally prescribe reasonable fees reflecting the cost of "staff required to produce a copy of the public record or records" and the costs associated with the "creation, purchase, or other acquisition of the public records."   *Id.* § 61.874(4)(a), (c).

KORA applies, with certain exemptions and additions, to county-level PVAs and their records of property taxes, valuations, and sales.   Ky. Rev. Stat. § 133.047.   Under the PVA-related statute, if an individual seeks information about their own property, "or any other person, including the press, seek[s] information directly related to property tax assessment . . . or similar matters," they can be charged the cost of reproduction.   *Id.* § 133.047(4)(c); *see id.* § 61.874(3).   However, if a requestor has a "commercial or business purpose," they may be charged a reasonable fee, as defined by KORA, including fees for "personnel time."   *Id.* § 133.047(4)(b). "Personnel time" is defined as "the cost to the agency to create any mechanical processing, data collection, or data creation; the staff required to process, produce, collect, or create data or information; or the cost to the agency for the creation, purchase, or other acquisition of information."   *Id.* § 133.047(4)(b)(2).   The state-level Department of Revenue develops a "reasonable fee schedule to be used in compensating for the cost of personnel time expended in providing information and assistance to persons seeking information to be used for commercial or business purposes."   *Id.* § 133.047(4)(b).   The fee schedule lists charges such as copy charges ($0.10); fax charges ($2.00 for a fax to a local number or $5.00 to a long-distance number); deed plotting ($10.00 per tract); and requests for comparable sales ($5.00 per property and $2.00 for each additional building), among others.   R. 1-1 (PVA Commercial Fee Guidelines at 1–3) (Page ID #34–36).   When requestors seek records for a "commercial" purpose, they must also submit a

"Request for Reproduction of PVA Public Records and Contract for Commercial Users," R. 1-2 (Request for Reproduction) (Page ID #37), and a "Contract and Fee Schedule for Commercial Users of PVA Office Records For Use When Non-Geographic Information System (GIS) Records are Requested," R. 1-3 (Contract & Fee Schedule) (Page ID #39). As clarified at oral argument, all requestors—with commercial or non-commercial purposes—can avoid fees if they retrieve the records in person.

**B. Zillow's Information Requests**

Zillow operates as a for-profit corporation and is publicly traded. R. 61-1 (Decl. Jonathan Mabe ¶ 3) (Page ID #3029). "Zillow owns and operates a portfolio of real estate and home-related brands" that focuses on "all stages of the home lifecycle" and aims to "empower[] consumers with unparalleled data, inspiration[,] and knowledge around homes." *Id.* ¶ 4. Zillow's website ("Zillow.com") is its most prominent brand and provides free access to "a living database of more than 110 million U.S. homes," including information regarding a property's price history. *Id.* ¶ 5. According to Zillow, around 131 million users access Zillow.com (and its corresponding app) each month. *Id.* ¶ 7 (Page ID #3030). Rather than charging these users for accessing Zillow.com, Zillow receives "revenue from selling lead generation and advertising space on its webpages to other businesses." *Id.* ¶ 8. Zillow "regularly makes public records requests to state officials," to ensure the information on its website is current. *Id.* ¶ 10.

In 2019, Susan Noto, a Source Acquisition Specialist at Zillow, emailed PVAs for Clark County, Franklin County, Henry County, Owen County, Shelby County, and Trimble County, requesting tax-assessment data pursuant to KORA. Each county PVA determined that, for the purposes of Noto's request, Zillow was a commercial requestor, and each PVA responded with a quote of what it would charge Zillow for the record information. The assessed fees for Zillow's requests ranged from $9,924.40 (Franklin County), R. 54-6 (Franklin Cnty. Emails at 1) (Page ID #1248), to $40,746.65 (Shelby County), R. 52-4 (Shelby Cnty. Invoice at 5) (Page ID #958).[1]

---

[1]Henry County would not provide a quote until Zillow filled out additional forms, R. 54-8 (Henry Cnty. Emails at 1) (Page ID #1252), but its PVA confirmed that it viewed Zillow as a commercial user and would have charged Zillow as such, R. 56 (Dep. Jason Scriber at 27–28) (Page ID #1468).

The PVAs viewed Zillow as seeking records for a commercial purpose for reasons including Zillow's status as a real-estate business, the fact that Zillow was requesting information about parcels that it did not own, and the PVAs' understanding that Zillow would use the data to attempt to generate a profit. R. 49 (Dep. Rebecca Johnson at 13–14) (Page ID #390–91); R. 51 (Dep. Jill Mahoney at 28–30) (Page ID #598–99); R. 52 (Dep. William Brad McDowell at 22–26) (Page ID #797–98); R. 53 (Dep. Jason Neely at 29–30) (Page ID #980–81); R. 55 (Dep. Blake Robertson at 28–29) (Page ID #1285); R. 56 (Dep. Jason Scriber at 23, 29–30 (Page ID #1467, 1468–69).

## C.  Procedural History

Based on the PVAs' determination that Zillow was seeking records for a commercial purpose and thus subject to enhanced fees, Zillow filed suit against the PVAs and the Kentucky Department of Revenue, claiming that KORA violated the First and Fourteenth Amendments, both facially and as applied. R. 1 (Compl. ¶¶ 1–2) (Page ID #3). Both sides filed motions for summary judgment.

The district court began with Zillow's facial challenge, holding that regulating access to government information can implicate the First Amendment. *Zillow v. Bork*, 593 F. Supp. 3d 619, 628–29 (E.D. Ky. 2022).[2] The district judge then divided the inquiry in two parts, considering, first, whether the commercial/non-commercial purpose distinction was content-neutral, and second, whether the exception to the enhanced fee for newspapers was constitutional. The district court determined that "[t]he commercial/non-commercial purpose distinction [was] content-neutral," and reasoned that "when access to government records is at issue, the First Amendment is *only* implicated when there is a content-based distinction." *Id.* at 629. Based on this reasoning, the district court concluded that there was no need to conduct "[f]urther analysis of the First Amendment challenge to the commercial/non-commercial purpose distinction." *Id.* at 629, 633.

---

[2]Daniel Bork has since been replaced by Thomas Miller, who appears on appeal.

The district judge then separately evaluated the newspaper exception to the commercial-purpose fee. *Id.* at 631. Applying strict scrutiny, the district court held that the "newspaper exception" violated the First and Fourteenth Amendments because it "allows some speakers to access the tax roll files at a lower cost" and was not narrowly tailored to a compelling government interest. *Id.* at 631–34. The district court also held that the commercial/non-commercial distinction did not implicate the Equal Protection Clause because it did not treat similarly situated persons differently, *id.* at 633, but that the newspaper exception was subject to the same standard of review as the free-speech claim to which it was tied, and the newspaper exception likewise failed strict scrutiny, *id.* at 634.

Having concluded that the newspaper exception, § 61.870(4)(b)(1), was unconstitutional, the district court simply severed it rather than striking down the entire commercial-fee statute. *Id.* at 635–36. The end result of the district court's analysis was to uphold the commercial versus noncommercial differential and to eliminate the exception for newspapers. In short, due to Zillow's lawsuit, both Zillow and newspapers would be subject to the full commercial-purpose requestor fees.

After the district court issued its Opinion and Order, Zillow filed a motion to alter the judgment and the Press filed an unopposed motion to intervene for the limited purpose of appealing. The Press argued that the district court's ruling "benefit[ted] only the government . . . at the press's expense" because it rendered newspapers subject to enhanced fees, just like Zillow. R. 72 (Mot. to Intervene at 5) (Page ID #3162). The magistrate judge granted the Press's motion to intervene. R. 73 (Order Granting Mot. to Intervene) (Page ID #3190). Upon the district court's denial of Zillow's motion to alter the judgment, R. 88 (Mem. Op. & Order) (Page ID #3251–57), the Press filed their notice of appeal. Zillow also filed a notice of appeal.

The Press argue that the district court erred by reaching Zillow's facial challenge at all, because the law regulates only access to records, not speech. Press Br. at 21. The Press further contend that the newspaper exception is a constitutionally permissible speech subsidy, and that the district court improperly severed it from the statute. *Id.* at 30, 55. Zillow argues that the commercial-purpose statute violates the First Amendment because it requires consideration of the "identity of the requestor and the manner in which they intend to use the information" when

determining who is eligible for reduced fees. Zillow Br. at 15. Zillow contends that the district court erred by treating the newspaper exception separately and severing it from the statute. *Id.* In response, the PVAs argue that the statutory scheme does not regulate speech and, in any event, is content neutral. PVA Br. at 13. But, in the alternative, the PVAs seek affirmance of the district court's order severing the newspaper exception alone. *Id.* at 27.

## II. DISCUSSION

### A. Standard of Review

"We review de novo a district court's grant of summary judgment." *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). At this stage, we "must view the evidence in the light most favorable to the non-movant and resolve all factual disputes in his favor." *Id.* Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### B. Facial Versus As-Applied Challenge

Zillow has framed its First Amendment claims around two arguments, which it characterizes as a facial challenge and an as-applied challenge. In its facial challenge, Zillow argues that the statute providing for "commercial purpose" fees is facially unconstitutional because the commercial/noncommercial distinction, and its three exceptions, embed an unjustifiable content- and speaker-based distinction into state law. *See* Zillow Br. at 15. In its as-applied challenge, Zillow argues that in concluding that Zillow was a commercial requestor, the PVAs relied on the content of Zillow's speech and Zillow's character as a commercial entity. *Id.* at 16. The district court evaluated what Zillow framed as a facial challenge and did not reach Zillow's as-applied challenge. *Zillow*, 593 F. Supp. 3d at 627, 632–34.

The Press argue that the district court erred by considering Zillow's facial challenge. They contend that binding precedent forecloses facial First Amendment challenges to statutes regulating access to government information. In addressing this argument, we must briefly distinguish among the forms of constitutional challenges. An as-applied constitutional challenge "consists of a challenge to the statute's application only to the party before the court."

*Amelkin v. McClure*, 205 F.3d 293, 296 (6th Cir. 2000) ("*Amelkin III*").[3]  By contrast, a facial challenge consists of a challenge that shows either "(1) that there truly are 'no' or at least few 'circumstances' in 'which the Act would be valid," or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)) (citations omitted).  In the context of free-speech challenges, however, courts "lighten this load" and permit parties to challenge statutes based on the statute's effect on other parties not before the court.  *Id.* at 335–36.  "Due to the risk that 'enforcement of an overbroad law' may 'deter[] people from engaging in constitutionally protected speech' and may 'inhibit[] the free exchange of ideas,' the courts will strike a law on its face 'if it prohibits a substantial amount of protected speech' both 'in an absolute sense' and 'relative to the statute's plainly legitimate sweep.'"  *Id.* at 336 (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).  These are known as overbreadth challenges.

In *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32 (1999) ("*United Reporting*"), the Supreme Court held that plaintiffs cannot raise facial overbreadth challenges to laws that merely regulate access to government information when the requestor does not claim their own First Amendment rights were violated by the statute.  That case concerned a state law restricting access to the addresses of arrestees and crime victims.  *Id.* at 40.  A private publishing service that provided such names and addresses to its customers, including attorneys and insurance companies, challenged the law as facially in violation of the First Amendment.  *Id.* at 34–37.  Because the publishers "had neither 'attempt[ed] to qualify' for access to the government's information nor presented an as-applied claim, . . . the Court assumed that the plaintiff had not suffered a personal First Amendment injury and could prevail only by invoking the rights of others through a facial challenge."  *Sorrell v. IMS Health Inc.*, 564 U.S.

---

[3]The *Amelkin* cases addressed the constitutionality of two Kentucky statutes, one of which limited access to police-accident reports and the other of which permitted the state custodian to charge commercial requestors of public documents a fee for producing the copies.  After the Supreme Court issued its opinion in *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32 (1999), the Court vacated and remanded our decision in *Amelkin v. McClure*, 168 F.3d 893 (6th Cir. 1999) ("*Amelkin II*").  In *Amelkin v. McClure*, 205 F.3d 293, 297 (6th Cir. 2000) ("*Amelkin III*"), we remanded the case back to the district court to evaluate an "as-applied" challenge to the "commercial requestor" statute.  On remand, the district court granted summary judgment to the defendants, which the plaintiffs appealed in *Amelkin v. McClure*, 330 F.3d 822, 828 (6th Cir. 2003) ("*Amelkin IV*").

552, 569 (2011) (quoting *United Reporting*, 528 U.S. at 40). The *United Reporting* plaintiffs could not succeed by invoking only the rights of others, because the government's mere refusal to supply information did not threaten to chill the speech of others not before the Court.

We applied *United Reporting* in *Amelkin III* in similar circumstances. In *Amelkin III*, several attorneys and chiropractors, as well as a proposed publisher of a commercial newspaper, challenged Kentucky statutes restricting access to police accident reports. 205 F.3d at 295. The theory relied upon by the plaintiffs, and by our court in an earlier iteration of the case, was that the records law was unconstitutional because it limited how *newspapers not before the court* could use records they received from the state. *Amelkin v. McClure*, 168 F.3d 893, 897 (6th Cir. 1999) ("*Amelkin II*"). This facial overbreadth theory was barred by *United Reporting*. Because the law did not otherwise "carry the threat of prosecution for violating the statute and it does not restrict expressive speech, but simply regulate[d] access" to government information, we concluded that plaintiffs' facial overbreadth challenge failed and remanded to the district court for consideration of their as-applied challenge. *Amelkin III*, 205 F.3d at 296.

We agree with the Press that *United Reporting* and *Amelkin III* would foreclose a facial *overbreadth* challenge in this case. The statute here—like the statute at issue in those cases—concerns a regulation of access to government information; it does not restrict how requestors can use information in their possession, nor does it carry any threat of prosecution or enforcement that might chill speech more broadly. Accordingly, Zillow could not rely merely on the unconstitutionality of the law as applied to others to facially invalidate the fee statutes. Zillow could not argue, for example, that a limitation on radio and television stations' use of the requested records rendered the statute facially unconstitutional. *See Amelkin v. McClure*, 330 F.3d 822, 826 (6th Cir. 2003) ("*Amelkin IV*"). That the fee statutes affecting access might be unlawful as applied to other hypothetical requestors would not be a basis for facially invalidating the statute.

However, Zillow raises both facial and as-applied challenges to the statute here. Zillow seeks to assert "its own rights" and the rights of similar "requestors classified as 'commercial purpose' requestors." *See* Zillow Br. at 24. Unlike the plaintiffs in *United Reporting*, Zillow has requested certain records and has been advised that it was a "commercial purpose" requestor

subject to enhanced fees.  Zillow's central challenge is that when the PVAs determined that it had a "commercial purpose," they considered Zillow's identity as a speaker and the content of its intended speech.  *See* Zillow Br. at 25.  Accordingly, Zillow's claim is that it suffered a First Amendment injury by virtue of the statute's application.

In light of *United Reporting* and *Amelkin III*, the district court should not have begun with Zillow's facial challenge, before considering whether Zillow's First Amendment rights were actually injured.  For if Zillow cannot demonstrate that it suffered a First Amendment injury because of the fee statute, it cannot ride on the effect that the statutes might have on others.  Of course, these challenges are not wholly distinct from each other, and analyzing whether the statute impermissibly discriminates against Zillow in an as-applied challenge calls for evaluation of the statutory text.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331–36 (2010).  This is hardly unusual; assessment of a statute within an as-applied challenge may "necessarily yield the conclusion that a statute is wholly invalid" because the statute has, for example, an impermissible purpose or is not narrowly tailored as applied to the individual plaintiff or those relevantly like it.  Richard H. Fallon, Jr., Commentary, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1338 (2000).  Indeed, when the *Amelkin* case returned to us for review of the plaintiffs' as-applied challenge, we considered whether the statute, as applied to the plaintiffs, conditioned access to government information on "the nature of the recipient's speech" or "disfavor[ed] discrete groups on content-related grounds."  *Amelkin IV*, 330 F.3d at 828.  In the interest of judicial efficiency, we consider the statutory component of Zillow's as-applied challenge.

## C.  First Amendment Implications

Having now framed the challenge in this case, we address a threshold question raised by the PVAs as to the merits:  whether regulations on access to government information have First Amendment implications at all.  It is well established that "[n]either the First Amendment nor the Fourteenth Amendment mandates a right of access to government information."  *Houchins v. KQED, Inc.*, 438 U.S. 1, 15 (1978) (plurality op.).  In general, the government can decline to disclose information in its possession without violating the First Amendment.  *See United*

*Reporting*, 528 U.S. at 40. "[T]here is no constitutional right to obtain all the information provided by FOIA laws." *McBurney v. Young*, 569 U.S. 221, 232 (2013).

We have recognized, however, that once the government decides to provide public access to information, the First Amendment places some limits on the government's discretion to decide who may receive information and on what terms. Although the majority opinion in *United Reporting* held that the requestors could not maintain a facial challenge to the statute, in concurrences and a dissent eight justices "recognized that restrictions on the disclosure of government-held information can facilitate or burden the expression of potential recipients and so transgress the First Amendment." *Sorrell*, 564 U.S. at 569. Justice Scalia's concurrence, for instance, noted that in an as-applied challenge, a requestor of information might prevail if a restriction upon access "*allow[ed]* access to the press . . . but at the same time *denie[d]* access to" other persons. *United Reporting*, 528 U.S. at 42 (Scalia, J., concurring). Justice Ginsburg remarked that "selective disclosure" could "impermissibly burden speech" if premised on suspect grounds, such as viewpoint. *Id.* at 42–43 (Ginsburg, J., concurring). Further, Justice Stevens noted that a "more difficult" question is "presented when the State makes information generally available, but denies access to a small disfavored class." *Id.* at 45 (Stevens, J., dissenting).

In *Amelkin IV*, we similarly recognized that an as-applied challenge to government regulations on access to information invited First Amendment scrutiny. 330 F.3d at 827–28. This position has been adopted by at least three other circuits when they have analyzed as-applied challenges to restrictions on access to governmental information. *See Boardman v. Inslee*, 978 F.3d 1092, 1107 (9th Cir. 2020) ("[T]he government is not insulated from First Amendment scrutiny when it discriminates invidiously in the provision of government-controlled information."); *Fusaro v. Cogan*, 930 F.3d 241, 255 (4th Cir. 2019) ("[A] First Amendment claim that challenges suspect conditions on access to government information must be available, at least where the plaintiff alleges circumstances indicating improper interference with protected speech."); *Lanphere & Urbaniak v. Colorado*, 21 F.3d 1508, 1512–13 (10th Cir. 1994) ("[T]he First Amendment can be implicated by the line drawing in Colorado's access-to-records statute.").

Zillow's challenge to the KORA fee statutes, therefore, triggers First Amendment scrutiny, because it draws lines as to the terms on which requestors may receive government information. It is true that KORA does not ultimately restrict any party's *access* to property-value information, nor does it restrict what the requestor might say with that information. *Cf. Sorrell*, 564 U.S. at 564–66. Rather, the Act permits governmental entities to charge higher fees when a requestor plans to use information for a "commercial" purpose compared with a requestor with a "noncommercial" purpose. We do not think that this spares KORA's fee structure from First Amendment scrutiny because "[t]he distinction between laws burdening and laws banning speech is but a matter of degree." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000). Here, Zillow is asked to pay thousands of dollars to access property-valuation records that would be disclosed at significantly lower rates to requestors without commercial purposes. Accordingly, we proceed to consider whether the lines drawn by Kentucky with respect to fees can weather constitutional scrutiny as applied to Zillow.

## D. First Amendment Analysis

As we have explained, governmental restrictions on access to information may violate the First Amendment. In *Amelkin IV*, we construed the separate opinions set out in *United Reporting* as guidance for reviewing an as-applied challenge to a statute regulating access to information. We identified the following principles, which we apply here. First, the government may not "condition the disclosure of [information] on the nature of the recipient's speech," such that a recipient is foreclosed from receiving information based on what the individual plans to say with it. *Amelkin IV*, 330 F.3d at 828; *see Sorrell*, 564 U.S. at 564–66. Second, the government may not "single[] out a small group for unfavorable treatment based either on the content or the viewpoint of the group's speech." *Amelkin IV*, 330 F.3d at 828; *see Sorrell*, 564 U.S. at 564–66. If such distinctions are drawn, the burden shifts to the government to justify its actions. We are concerned, of course, that the government will use access to information to benefit its preferred speech and to suppress disfavored speech.

As to the first principle, we note that the fee statutes, as applied to Zillow, "do[] not restrict or even regulate expression." *Amelkin IV*, 330 F.3d at 827. To the extent Zillow can

obtain the information it seeks, "the statute in question places no restriction on how [it] may use that information." *Id.*

Indeed, Zillow's arguments seem to focus primarily on the second principle. Zillow contends that the distinctions drawn in the statute impermissibly discriminate on speaker- and content-based grounds. Citing the three exceptions to the definition of commercial purpose, Zillow contends that the category discriminates among speakers, *see* Zillow Br. at 21, 27–29, and requires consideration of the content of the requestor's intended speech.[4]

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Determining whether a statute is content based is a delicate matter. "[A] regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2021). Likewise, "[b]ecause 'speech restrictions based on the identity of the speaker are all too often simply a means to control content,' we have insisted that 'laws favoring some speakers over others demand strict scrutiny when the legislature's speech preference reflects a content preference.'" *Reed*, 576 U.S. at 170 (first quoting *Citizens United*, 558 U.S. at 340; then quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)).

To begin, we do not think that the fundamental distinction drawn by the statute—between requestors with commercial and those with non-commercial purposes—distinguishes based on the content of the requestor's intended use for the records received. A commercial purpose is defined as the use of information for "sale, resale, solicitation, rent, or lease of a service, or any use by which the user expects a profit either through commission, salary, or fee." Ky. Rev. Stat. § 61.870(4)(a). By its terms, KORA's differential treatment does not reflect favor or disfavor

---

[4]As noted above, the district court construed Zillow as raising two separate arguments, one regarding the commercial/non-commercial purpose distinction and another regarding the newspaper exception. *Zillow*, 593 F. Supp. 3d at 629. The district court also held that Zillow had waived any challenge to the other exceptions to the commercial-purpose statute. *Id.* at 630. We do not read Zillow's briefs in the same way. We understand Zillow to be challenging the commercial-purpose statute, and to treat the exceptions for newspapers, among others, as aspects of that challenge. *See* R. 61 (Zillow's Mot. for Summ. J. at 11–12) (Page ID #3018–19); Zillow Br. at 21–22, 25. Accordingly, we see no reason to ignore the other exceptions when reviewing the statute on appeal.

toward the content of a requestor's message. Indeed, PVAs do not need to evaluate the topic or message of any speech to determine a requestor's status under KORA. Two requestors could intend to engage in the exact same speech, one for profit and one not, and this would suffice to distinguish the cases for purposes of the statute. In this way, KORA's commercial/non-commercial purpose distinction is much like the on-/off-premises distinction found to be content-neutral in *City of Austin*. There, too, the signs could advertise the same business, the only meaningful difference being their location. Although determining whether a requestor's intended use has a profit-purpose may require some examination of the nature of the requestor's proposed "function or purpose," it does "not single out any topic or subject matter for differential treatment." *See City of Austin*, 596 U.S. at 71, 74.

To be sure, the category of "commercial purpose" includes the category of speech known as "commercial speech," but we do not think it is so limited. The "core notion of commercial speech [is] 'speech which does no more than propose a commercial transaction.'" *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983) (quoting *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976)). Accordingly, when determining whether speech is properly characterized as "commercial," we consider whether the speech involves an advertisement, whether it references a product, and whether the motivation for speaking is economic. *See id.* at 66–67; *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112–113 (6th Cir. 1995). The definition of commercial purpose in the statute here goes beyond this category by encompassing "any use by which the user expects a profit either through commission, salary, or fee." Ky. Rev. Stat. § 61.870(4)(a).

The dissent argues that the distinction between a commercial and noncommercial purpose is content based because it "allow[s] the government to inquire about, and ultimately assess fees for, what use Zillow makes of the data—whether for profit or not, that means what kind of speech Zillow uses the data for." Dissent at 23. We fail to see how this distinction is content based. The distinction drawn has nothing to do with the actual content created by the requestor, only whether that content will be used to obtain a profit. The statute does not even require any investigation into what the requestor will be talking about.

The distinction drawn here is, accordingly, nothing like the one drawn in *Sorrell*, which was calibrated to silence pharmaceutical marketing speech. *Sorrell*, 564 U.S. at 564. Nor is the statute relevantly like the one at issue in *Discovery Network, Inc. v. City of Cincinnati*, 946 F.2d 464 (6th Cir. 1991), *aff'd sub nom. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), the other case on which the dissent principally relies. *Discovery Network* concerned an ordinance that prohibited the distribution of publications that advertised products or directed attention to businesses or events for the purpose of promoting sales. *Discovery Network*, 946 F.2d at 466 n.2. Essentially, the ordinance discriminated against core commercial speech. Here, as we have explained, the statute does not discriminate between commercial and noncommercial speech but looks only to whether the requestor seeks some profit on account of their speech. Unlike *Discovery Network*, commercial fees are not levied based on whether someone is crafting an advertisement. The dissent tacitly admits as much in its subsequent acknowledgment that the commercial-purpose category includes speech that the "First Amendment staunchly protects." Dissent at 27; *see id.* at 24. Yet, the dissent fails to appreciate that the application of the commercial fee statute to both commercial and noncommercial speech undermines the dissent's purported content-based line.

Zillow also argues that, even if the commercial/non-commercial purpose distinction is not content based, the exceptions render it so. Pointing to the statutory elements of the exceptions that speak to the type of intended speech—"[p]ublication or related use" for newspapers or periodicals, "news or other informational programs" for radio and television stations, and "[u]se . . . in the preparation for prosecution or defense of litigation, or claims settlement" by attorneys or litigants, Ky. Rev. Stat. § 61.870(4)(b)—Zillow argues that the statute requires officials to delve into the substance of the requestor's intended speech and price records based on what they planned to say. *See* Zillow Reply Br. at 9 ("[T]he law requires an examination of . . . how the requestor has used and intends to use the public records.").

The Press, by contrast, ask us to view the exceptions (or at least the newspaper exception), "as a subsidy, not a burden." Press Br. at 30. According to the Press, the law "simply carves out one potential for-profit use of public records—publication in a newspaper or

periodical—from the general definition of 'commercial purpose,' then subsidizes that use by charging lower reproduction fees." *Id.* (citation omitted).[5]

Ultimately, whether we view the exceptions as subsidies for certain speakers or as features of the commercial-purpose definition, Zillow has not demonstrated that the law discriminates impermissibly in violation of the First Amendment. We note at the outset that Zillow has not alleged viewpoint discrimination, so we turn to its arguments that the exceptions embed some content- or speaker-based discrimination.

We have recently recognized that applying an exception can render a statute content-based to the extent it requires consideration of the topic or subject matter of the speech to determine whether the speech qualifies for a given exception. *Norton Outdoor Advert., Inc. v. Village of St. Bernard*, 99 F.4th 840, 850 (6th Cir. 2024). Accordingly, in *Norton Outdoor Advertising*, we held that the ordinance exempting public-service signs from certain regulations was content based because it required consideration of "whether the content of a given sign serves a 'public service,'" a determination "laden with the types of content-based and value-judgment determinations that call for strict scrutiny under the First Amendment." *Id.*

The exceptions to the commercial-purpose definition here are unlike the public-service exception in *Norton Outdoor Advertising*. Whereas that ordinance drew distinctions based on

---

[5]The upshot of viewing the exceptions as a subsidy is that the government generally does not violate the First Amendment by subsidizing select speech except when the government selects speech based on its viewpoint. *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545–46 (1983); *see Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359–61 (2009); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 834 (1995). The government may subsidize speech based on its content or speaker without offending the First Amendment. *Regan*, 461 U.S. at 545–46 (holding that less favorable tax treatment of organizations engaged in lobbying speech did not violate the First Amendment).

Zillow objects to characterizing the exceptions as subsidies. Zillow argues, first, that other entities beyond newspapers get exceptions too. Zillow Br. at 25. But this is relevant in the subsidy context only if the government discriminated based on viewpoint, which Zillow does not allege. Zillow further objects that "the legislature did not provide a mere subsidy, but removed a substantial financial obstacle divorced from the actual cost to the agency of reproducing the records." *Id.* at 25–26. Yet this is merely to describe a subsidy in other words. Finally, Zillow cites Justice Ginsburg's concurrence in *United Reporting*, in which she described government provision of information as a "kind of subsidy to people who wish to speak" and commented that "once a State decides to make such a benefit available to the public, there are no doubt limits on its freedom to decide how that benefit will be distributed." *Id.* at 26 (quoting *United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring)). While this argument has more bite, Justice Ginsburg was not conclusive as to the exact standard to be applied, and she cited *Regan* for the proposition that "if the award of the subsidy is not based on an illegitimate criterion such as viewpoint," the state may discriminate. *United Reporting*, 528 U.S. at 43 (Ginsburg, J., concurring).

the subject matter of the signs themselves, the statute here does not.  In determining whether an exception applies to Zillow, the local official need only determine whether Zillow is a "newspaper or periodical," "a radio or television station," or a party or attorney to a legal action. Ky. Rev. Stat. § 61.870(4)(b).  As relevant here, insofar as Zillow is not any of these, officials need not consider the content of Zillow's speech at all.  And as we have explained, in this as-applied challenge, Zillow cannot prevail on a theory that, for example, when determining whether a news organization *not* before the court seeks to access records, the official might need to consider the content to determine if their intended speech comprises a "[p]ublication or related use." Ky. Rev. Stat. § 61.870(4)(b); *see Amelkin IV*, 330 F.3d at 826.

Zillow further argues that the exception of certain requestors from commercial fees is impermissible speaker-based discrimination.  Classifying a law as speaker based is "only the beginning—not the end—of the inquiry." *Reed*, 576 U.S. at 170; *see Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620–21 (2020) (plurality op.).  Our touchpoint is whether a drawn distinction evinces a preference among "topic[s] discussed or the idea[s] or message[s] expressed." *Reed*, 576 U.S. at 163.  Yet, Zillow does not explain why this purported speaker-based discrimination embeds any content preference. *See* Zillow Br. at 21, 27–29.  As we noted in *Amelkin IV*, a statute limiting access to government information would be "constitutionally suspect if it had singled out a small group for unfavorable treatment *based either on the content or the viewpoint of the group's speech*."  330 F.3d at 828 (emphasis added).  Perhaps we are to believe that by providing lower-price information to news-like organizations and not to other commercial-purpose requestors, Kentucky evinces a preference for news as opposed to other types of speech made for a profit.  If this is Zillow's argument, however, it is difficult to distinguish from the argument rejected in *Amelkin IV*.  In that case, the statute made accident reports available only to the parties and news-gathering organizations.  Even though that statute inherently embedded a preference for news-gathering organizations over other speakers, we did not find this distinction "disfavor[ed] discrete groups on content-related grounds." *Amelkin IV*, 330 F.3d at 827–28; *see also Leathers v. Medlock*, 499 U.S. 439, 447–49 (1991) (rejecting the proposition that discriminating between newspapers and cable providers for tax treatment was content-based or "threaten[ed] to suppress the expression of particular ideas or viewpoints").  The trouble for Zillow here, as for the requestors in *Amelkin IV*, is that Zillow is not a member of

any discrete, disfavored group, but merely a commercial-purpose requestor not eligible for an exception.[6, 7]

**D.  Equal Protection**

Zillow also claims that the Kentucky commercial-fee statutes violate the Fourteenth Amendment's Equal Protection Clause.  Zillow Br. at 11–13.  "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  To prevail on an equal-protection claim, a petitioner must show that a similarly situated person has been treated disparately.  *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010).  "Once disparate treatment is shown, the legal standard for analyzing any equal protection claim depends upon the classification used by the government."  *Id.*  "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest."  *City of Cleburne*, 473 U.S. at 440.  However, when fundamental rights are at issue, legislation is reviewed according to the applicable standard, i.e., if a statute imposes a content-based restriction on speech, it will generally be reviewed under strict scrutiny.  *Chambers v. Stengel*, 256 F.3d 397, 401 (6th Cir. 2001).

Zillow's "equal protection claim largely rises or falls with their free speech claim."  *First Choice Chiropractic, LLC v. DeWine*, 969 F.3d 675, 684 (6th Cir. 2020).  Having determined that the commercial-purpose statutes do not discriminate based on content, we apply rational-basis review to Zillow's claim.  We have no doubt that a rational basis supports Kentucky's difference in fees for commercial and non-commercial requestors.  As the PVAs explain in their

---

[6]Zillow does not argue that the statute imposes a content-neutral regulation of its speech, and we treat any such challenge as forfeited.

[7]The dissent contends that *Amelkin IV* is distinguishable because the relevant statute in that case "prohibited access to the general public—with a few exceptions" whereas here, "KORA grants access to the general public and then burdens access for certain parties based on the content of their intended speech."  Dissent at 26. This argument fails because the commercial-purpose distinction is not based on the content of the intended speech. Further, as a commercial-purpose requestor, Zillow is not part of a discrete group engaged in specific speech, like "attorneys and chiropractors."  *Amelkin IV*, 330 F.3d at 828.

brief, "[t]he distinction allows a public agency to recoup costs associated with collecting, creating, storing and producing information from individuals using that information for commercial gain as opposed to individuals seeking the information for other reasons." PVA Br. at 26. That certain commercial requestors such as newspapers and radio stations are exempted does not render the distinction arbitrary, for the state has a legitimate interest in ensuring the press and parties to litigation can obtain records at a reasonable fee.[8]

### E.  Zillow's Additional As-Applied Challenge

Zillow finally argues that we should, alternatively, grant relief or remand to the district court on what Zillow has framed as its as-applied challenge. This challenge, which was not addressed by the district court, turns on the way that the local PVAs administered the commercial-purpose statute and its various exceptions with respect to Zillow. *See* Zillow Br. at 36–37. According to Zillow, the commercial-purpose statute was unconstitutionally applied when the local PVAs took account of the content of Zillow's website and the nature of its business in determining that it was subject to enhanced fees (and ineligible for the newspaper exception). *Id.* at 36–39.

We disagree. The deposition testimony simply goes to the question whether Zillow had a commercial purpose or not and whether Zillow was a newspaper or not. For example, when asked "[w]hat about Zillow . . . made them not a newspaper," former PVA official Neely replied, "[t]hey print no news" and "[t]hey give no insight behind anything." Zillow Br. at 37 (quoting R. 53 (Neely Dep. at 34) (Page ID #973)). PVA official Robertson responded that Zillow's website did not include the types of things like "weather, sports . . . [and] news" that he expected in a newspaper. *Id.* (quoting R. 55 (Robertson Dep. at 33) (Page ID #1278)). Zillow argues that because these officials' judgments were based on the "scope of a newspaper's content" and turned on some examination of the content of Zillow's website, they were impermissibly content-based judgments. *Id.* at 38. Yet, we know from *City of Austin* that even "restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." 596 U.S. at 72. As we have explained, we do not think that the mere need to examine the nature

---

[8]We do not reach the question of severability.

of Zillow's business and the type of content on its website (compared with a newspaper) renders the statute content based. Accordingly, we decline to remand for consideration of these issues.

## III. CONCLUSION

Consistent with our conclusion that KORA's commercial-purpose fee statute is constitutional as applied to Zillow, we REVERSE the district court's grant of partial summary judgment to Zillow, VACATE the permanent injunction entered by the district court, and REMAND to the district court with instructions to grant summary judgment to the PVAs.

———————

**DISSENT**

———————

BOGGS, Circuit Judge, dissenting.   The majority is correct that KORA implicates the First Amendment.   KORA's two-tiered fee structure distinguishes between those requesting tax-roll records for "any use by which the user expects a profit" and everyone else.   Ky. Rev. Stat. § 61.870(4)(a).   The majority and dissent agree that KORA thus does burden more than simply "commercial speech."   *See* Maj. Op. at 16.   However, the distinction between commercial and non-commercial requesters is, on its face, content-based.   And because it is content-based, the proper analytical framework is strict scrutiny.

In *Discovery Network, Inc. v. City of Cincinnati*, we struck down a Cincinnati law that prohibited the placement of newsracks with "commercial" material in certain public spaces, but allowed newsracks with "non-commercial" content, defined to include conventional newspapers such as the New York Times.   946 F.2d 464, 472 (6th Cir. 1991).   That law did not pass constitutional muster for numerous reasons—one being that it was an impermissible content-based restriction on speech that could not survive strict scrutiny.   *See id.* at 472–73.   The Supreme Court affirmed and made it clear that the commercial/non-commercial distinction within the Cincinnati statute was content-based.   *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993) ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'").

Like KORA, the Cincinnati law at issue in *Discovery Network* was not concerned with any specific ideas espoused by any of the publications.   It swept up all sorts of publications with varying subject matter.   *See Discovery Network*, 946 F.2d at 465–66.   The only common thread between the plaintiff publications affected by the statute was that they were "commercial."   So the law was content-based because commercial character determined whether certain speech was regulated or not, and that was a distinction based on the message conveyed.

Admittedly, KORA's commercial/non-commercial distinction is not as blatantly content-based as many statutes that may come before us are. KORA does not, for instance, prohibit Zillow from editorializing about the tax-roll data. The law doesn't really care about the format of Zillow's presentation of the data, or the subject matter of any publication that uses the data. But the law does allow the government to inquire about, and ultimately assess fees for, what use Zillow makes of the data—whether for profit or not, that means what kind of speech Zillow uses the data for. This distinction falls squarely within the meaning of content-based.

"This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565–66 (2011)). Again, as the majority opinion correctly notes, KORA does not explicitly restrict or even regulate any particular subject matter. But "[s]ome facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Ibid.* The distinction that KORA draws between commercial and non-commercial use may be subtler than distinctions drawn with reference to subject matter, but it remains a "distinction[] drawn based on the message a speaker conveys, and, therefore . . . subject to strict scrutiny." *Id.* at 163–64.[1]

The majority opinion omits a crucial point in its analysis. It states that the statute "does not reflect favor or disfavor toward the content of a requestor's message." Maj. Op. at 14–15. But the "crucial first step," *Reed*, 576 U.S. at 165, is determining whether the statute is content-based on its face—without consideration of whether the statute expressly prefers or disfavors certain ideas or whether the state has a compelling justification, *see ibid.* ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated

---

[1]The Supreme Court's decision in *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022), seemed to limit the reach of the "function or purpose" language in *Reed*. But *Austin* merely stated that a "classification that considers function or purpose is [not] *always* content based." *Id.* at 74. It does not stand for the proposition that a statute that facially distinguishes between particular functions or purposes of speech is never content-based. Moreover, the issue in *Austin* was an off-premises/on-premises regulation on commercial signage and not a commercial/non-commercial distinction.

speech." (quoting *Discovery Network*, 507 U.S. at 429)), or the commercial nature of the regulated speech, *see Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020).

Here, as in *Discovery Network*, the "very basis for the regulation is the difference in content between [non-commercial speech] and commercial speech." 507 U.S. at 429. And the message that the speaker will convey controls the government action. *See Sorrell*, 564 U.S. at 564 (2011) ("[T]he [statute] prohibits pharmaceutical manufacturers from using the information for marketing. The statute thus disfavors marketing, that is, speech with a particular content.").**2** KORA disfavors "commercial" use of the tax-roll data as opposed to, say, a researcher who will use the information to advance her tenure prospects or to raise the profile of her podcast. This is a content-based distinction on speech, so it must face strict scrutiny. *Int'l Outdoor*, 974 F.3d at 703 ("[A] regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*.").

To be sure, the Supreme Court has touched on this issue since we decided *International Outdoor*—to the extent that it suggested in dicta that *Reed* may not always apply to commercial speech. In *Austin*, the Court stated that "[t]he *Metromedia* Court did not need to decide whether the off-premises prohibition was content based, as it regulated only commercial speech and so was subject to intermediate scrutiny in any event." 596 U.S. at 73 (citing *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–12 (1981) (plurality opinion)). The *Austin* Court also stated in a footnote that "[t]he Court of Appeals further considered the possibility that the code provisions regulated only commercial speech, such that only intermediate scrutiny would apply even if the provisions were content based." *Id.* at 68 n.3. But *Austin* upheld a sign regulation *because* the regulation was content-neutral and applied to both commercial and non-commercial speech. The regulation was "agnostic as to content" and thus a "location-based, rather than

---

**2**The statute in *Discovery Network* and KORA differ in two significant ways. First, the statute in *Discovery Network* made distinctions about speech already in the speaker's possession. KORA instead regulates the dissemination of information in the government's possession. But as the majority opinion correctly holds, Maj. Op. at 13—KORA is more than a simple "right to access" scheme. It implicates the First Amendment because the government has opened up record access to the public and then put barriers to that access for a group of requesters. *See Amelkin v. McClure*, 330 F.3d 822, 827–29 (6th Cir. 2003). Second, the statute in *Discovery Network* operated as a ban, while KORA only burdens speech through a fee structure. But the "'distinction between laws burdening and laws banning speech is but a matter of degree' and . . . the 'Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans.'" *Sorrell*, 564 U.S. at 565–66 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000)).

content-based, determination." *Norton Outdoor Advert., Inc. v. Vill. of St. Bernard*, 99 F.4th 840, 848 (6th Cir. 2024) (quoting *Austin*, 596 U.S. at 69). In any event, we are bound by Circuit precedent and not Supreme Court dicta.

So, looking beyond *International Outdoor*'s clear holding, the standard governing content-based restrictions on commercial speech is admittedly a bit muddled. Of course, *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), governs content-neutral restrictions on commercial speech.[3] But it does not then automatically follow that its intermediate-scrutiny test applies to all commercial speech—even if the distinctions at issue are content-based. That outcome would contravene clear Sixth Circuit and Supreme Court precedent.

In *R.A.V. v. City of St. Paul*, the Court applied strict scrutiny to a content-based restriction on fighting words. 505 U.S. 377, 394 (1992). Because commercial speech has traditionally received more First Amendment protection than fighting words have, *id.* at 422–24 (Stevens, White & Blackmun, JJ., concurring in the judgment), some lower courts have recognized that strict scrutiny could apply to content-based restrictions of commercial speech. *See, e.g.*, *MD II Ent., Inc. v. City of Dallas*, 28 F.3d 492, 495 (5th Cir. 1994); *Valley Broad. Co. v. United States*, 107 F.3d 1328, 1331 n.3 (9th Cir. 1997); *Holding v. Mun. of Anchorage*, 63 P.3d 248, 253 n.27 (Alaska 2003). Since then, the Court has applied *Central Hudson* to some content-based restrictions on commercial speech, *see, e.g.*, *United States v. Edge Broad. Co.*, 509 U.S. 418, 426–30 (1993) (lottery advertisements); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 482 (1995) (alcohol labels); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 184 (1999) (casino advertisements), but not all, *see, e.g.*, *Playboy Ent. Grp.*, 529 U.S. at 813 (sexual television programming); *Sorrell*, 564 U.S. at 559 (pharmaceutical advertisements).

And even when it applied *Central Hudson*, the Court rejected the idea that "*all* commercial speech regulations are subject to a similar form of constitutional review simply because they target a similar category of expression." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality opinion); *see also id.* at 518 (Thomas, J., concurring in part

---

[3]Even so, *Central Hudson* "has been applied with a severity that borders on strict scrutiny." Robert Post, *The Constitutional Status of Commercial Speech*, 48 U.C.L.A. L. Rev. 1, 42 (2000).

and in the judgment) (rejecting *Central Hudson*). And it emphasized that the relevant distinction between intermediate and strict scrutiny is not between commercial and non-commercial speech but rather between "content-based speech restrictions" and "traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech." *See Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 620 (2020) (plurality opinion) (applying strict scrutiny to a law exempting debt-collection calls from the federal prohibition on robocalls); *see also id.* at 639–40 (Breyer, Ginsburg & Kagan, JJ., concurring in part and dissenting in part) (characterizing debt collection as commercial speech). So a content-based restriction that is directed at speech, such that it imposes more than "incidental" burdens, is subject to strict scrutiny, regardless of whether it restricts commercial speech. And here, the same data could be used by Zillow to note on its site that Elon Musk has a house worth 8 figures (for which it would pay a hefty fee), or to say that it is obscene to have such an expensive house (no fee)—surely a content-based speech burden.

Moreover, we have already contemplated a statutory framework like KORA's commercial/non-commercial distinction and said that it would require heightened scrutiny. In *Amelkin v. McClure*, we said that a different Kentucky "right to access" statute was "neither a direct regulation of expression nor a purely content-neutral law of general application." 330 F.3d 822, 827 (6th Cir. 2003). The statute in *Amelkin* prohibited the public from accessing accident reports but allowed access to certain groups—the press and the accident parties. We said that it likely did not offend the First Amendment.

But that statute prohibited access to the general public—with a few exceptions. KORA grants access to the general public and then burdens access for certain parties based on the content of their intended speech—exactly what the *Amelkin* court said would make a statute "constitutionally suspect." *See id.* at 828. We said:

> The statute would also be constitutionally suspect if it had singled out a small group for unfavorable treatment based either on the content or the viewpoint of the group's speech. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987) (holding a state sales tax scheme unconstitutional that taxed general-interest magazines, but exempted newspapers and religious, professional, trade, and sports magazines). If, for example, the statute provided for the disclosure of accident reports to the general public, but prohibited their disclosure to attorneys

and chiropractors, this principle would be implicated. *See Legi-Tech, Inc. v. Keiper*, 766 F.2d 728, 731 (2d Cir. 1985) (holding a state statute unconstitutional that permitted the general public to access a state-maintained database of pending legislation, but denied such access to "those entities which offer for sale the services of an electronic information retrieval system which contains data relating to the proceedings of the legislature").

*Ibid.*

Accordingly, I would hold that the commercial/non-commercial distinction in KORA is a content-based distinction on speech that requires strict scrutiny and remand for consideration under that proper standard. *See Int'l Outdoor*, 974 F.3d at 708.

I agree with the majority that KORA's scope is so broad that it not only regulates purely commercial speech, but also sweeps into its coverage a great deal of non-commercial speech. But though the majority and dissent agree that KORA burdens both commercial and non-commercial speech, we part on whether that distinction can be called "content-based," and thus implicates full First Amendment protection. Even a brief consideration of the following examples reveals that the First Amendment staunchly protects much of the profit-generating speech that KORA now seeks to burden.

Imagine, for example, a political commentator who charges readers a fee to access online critiques of local elected officials. Should that commentator seek information from Kentucky records to use in political discourse, KORA would then allow the state government to burden that speech, because "the user expects a profit either through commission, salary, or fee." Ky. Rev. Stat. § 61.870(4)(a). Yet "interactive communication concerning political change" is core political speech; the government must overcome a "well-nigh insurmountable" burden should it ever try to regulate in this space. *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988). Or consider a documentary filmmaker, who seeks access to Kentucky public records while factchecking her movie's script. According to the statutory language in KORA, which the majority clearly accepts, any attempt by the filmmaker to profit from her artistic expression has transformed that expression into commercial speech, and caused it to lose some of its First Amendment protection. Such an argument has already been squarely considered and rejected by the Supreme Court. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). At its most

extreme, KORA's language, which penalizes "any use by which the user expects a profit . . . [via] salary" might even apply to a professor seeking tenure at a university. Should he access Kentucky state records while writing a paper that ultimately wins him tenure, any resulting increase in that professor's salary implicates KORA's increased burden on speech with a "commercial purpose." Yet academic freedom "is of transcendent value to all of us and . . . . therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

In making these distinctions, KORA does authorize the government to investigate how certain words and concepts are used and intended. In my view that cannot be called "content-neutral" examination. KORA is thus subject to review under *Reed*, *see Int'l Outdoor*, 974 F.3d at 703–04, and under *Reed*, KORA's plainly content-discriminatory structure mandates that we apply strict scrutiny, 576 U.S. at 156.

I conclude by noting that, if the commercial-purpose/non-commercial-purpose scheme does fail strict scrutiny, then the broadscale outcome is that the government cannot distinguish between commercial-purpose and non-commercial-purpose requesters. But that could be achieved in more ways than one. On one hand is a statutory scheme that does not charge any requester. On the other is a scheme that charges commercial-purpose and non-commercial-purpose requesters alike. There is no such bright line between news-gathering entities and for-profit entities. *See Discovery Network*, 946 F.2d at 467 n.4. KORA's attempt to draw such a distinction is problematic because it requires that the government choose which entities are focused "solely" on profit—as opposed to those who make millions or billions in the course of virtuous purveying of "news" ("The Press")—and then decide who is entitled to constitutional protections.[4] Deciding—on content-based grounds—what "merits classification" as The Press

---

[4]Indeed, one argument that Zillow itself advances (and which the majority leaves for the district court to consider) is that, regardless of whether KORA is constitutional, the company's website is a "periodical" that qualifies for the statute's newspaper exception. Zillow Br. at 21, 26. The nature of this dilemma (determining precisely who qualifies as "The Press") is precisely why courts have long understood the First Amendment's Freedom of the Press Clause to apply not just to a select industry of organized publications, but rather to anyone who uses the press (or its modern equivalents). *See* Eugene Volokh, *Freedom for the Press as an Industry, or for the Press as a Technology? From the Framing to Today*, 160 U. Pa. L. Rev., 459, 463–65 (2012).

resembles government licensing of The Press and risks "government interference into protected activity." *Ibid.*; *see also Discovery Network*, 507 U.S. at 423 n.19.

For each of these reasons, I respectfully dissent.